# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

DAVID MARSHALL, III and LAMISA )
MARSHALL, )
                   )
         Plaintiffs, )
                   )
         v. )         CAUSE NO.: 2:14-CV-50-TLS
                   )
TOWN OF MERRILLVILLE, OFFICER )
ALLISON ELLIS, individually and in her official )
capacity, and OFFICER TIMOTHY FINNERTY, )
individually and in his official capacity, )
                   )
         Defendants. )

## OPINION AND ORDER

This matter comes before the Court on Defendants Town of Merrillville, Officer Allison Ellis, and Officer Timothy Finnerty's Motion for Summary Judgment [ECF No. 60] and Motion to Bar Opinions and Testimony [ECF No. 62]. The Plaintiffs, David Marshall, III, and LaMisa Marshall, filed a state court Complaint [ECF No. 1] on January 23, 2014, alleging claims under 42 U.S.C. § 1983 and state tort law, which was removed to federal court pursuant to 28 U.S.C. §§ 1441 and 1446. This matter is fully briefed and ripe for the Court's review.

## FACTS OF THE CASE

On June 5, 2013, the Plaintiffs attended their daughter's graduation ceremony for Merrillville High School. The ceremony was held in the auditorium of the Radisson Theater in Merrillville, Indiana. The Plaintiffs attended with a large number of family members[1] and sat in two adjacent rows in the middle section of the first floor. There were some rows of people seated

---

[1] The family members included Plaintiffs David and LaMisa Marshall, their children TaMar and Ella, LaMisa's mother Mary Woods, their cousins Lawrence and Michelle Thurmond, their cousins' children Maurice and Antoinette, mother-in-law Mrs. Greer, "and various other family members" (D. Marshall Dep. 9:12–17, ECF No. 67-3.)

behind the Plaintiffs' party. The graduation ceremony began with the singing of the national anthem. Once the national anthem concluded, someone shouted something in the auditorium. The Defendant Officers approached the Plaintiffs' party, discussed that disturbance with them, escorted the Plaintiffs out of the auditorium, and did not permit David Marshall to return to the ceremony. Although the parties agree on this bigger picture, they dispute most of its details.

## A.      The Plaintiffs' Version of Events

David Marshall was seated in the first row of Plaintiffs' party on the end of that row, with LaMisa Marshall seated to his left. (D. Marshall Dep. 9:22.) Seated in the row directly behind them were Lawrence and Michelle Thurmond. (*Id.* at 12:1.) While the national anthem was going on, David Marshall and Lawrence were trying to locate the latter's daughter on stage (who was also graduating), eventually "pointing out that both . . . daughters were sitting next to each other." (*Id.* at 12:7–14.) At the national anthem's conclusion, "a lady's voice yelled out and said 'BoBo Ducy' or something like that, really loud, just out of nowhere." (L. Marshall Dep. 6:17–22, ECF No. 61-2.) The person who yelled that "was in back of" the Plaintiffs' party (D. Marshall Dep. 11:3–4), although the Plaintiffs "didn't know who was yelling" (*Id.* at 14:1).

Immediately thereafter, Officer Ellis came over to the Plaintiffs' party because she believed that they were the source of the yelling. (*Id.* at 12:21–13:1.) Officer Ellis singled out Michelle as the yeller and "told Michelle to shut up." (*Id.* at 12:11–17.) All of the members in the Plaintiffs' party "told [Officer Ellis] that we were not the ones yelling." (*Id.* at 12:21–22.) Additionally, David Marshall "identified [him]self as a police officer with [his] ID," as did Lawrence. (*Id.* at 11:19–23.) The Defendant Officers were members of the Merrillville Police Department, whereas David Marshall was a detective with the Lake County Sheriff's Office. (D. Marshall Dep. 6:2–3.) Lawrence was also a police officer, but the parties did not specify for

which municipal entity he worked. As the Plaintiffs' party tried to explain to Officer Ellis that they were not the source of the disturbance and were not making any noise, "several other Merrillville officers came" over to them in "a very short amount of time." (*Id.* at 13:4–12.) "They were argumentative, and they would not let [the Plaintiffs' party] explain what was going on. One of the officers . . . even slapped down [David Marshall's] cousin's hands." (*Id.* at 14:13–16.)

After just a minute elapsed, Sergeant Finnerty approached and said "let's go outside and talk about it" to the Plaintiffs. (*Id.* at 15:7–8.) The police officers kept pushing both of the Plaintiffs until they were outside of the auditorium and its lobby. (*Id.* at 15:16–23, 16:6–14.) Once the Plaintiffs were outside, Sergeant Finnerty said that if David Marshall "continued to talk," he would "be going to jail for disorderly conduct." (*Id.* at 16:23–24.) David Marshall said, "You all know me as a police officer. Why are you treating me as if I'm not a police officer, that I would be disruptive?" (*Id.* at 17:5–7.) He was upset but remained peaceful throughout this interaction, calling his sergeant to get his advice and try to resolve the situation, but Sergeant Finnerty "said again if [he] was to keep on talking that [he'd] be going to [his] own jail." (*Id.* at 17:7–9, 18:2–6.) LaMisa Marshall was "kept outside the building about five minutes" after talking with some of the officers. (L. Marshall Dep. 10:2–3.) Ultimately, LaMisa Marshall was permitted to go back inside, while David Marshall was not arrested or charged but was barred from returning to the auditorium for the remainder of the ceremony. (*Id.* at 10:6–11.)

## B.     The Defendants' Version of Events

The Defendant Officers were acting as security at the graduation ceremony. (Town Interrog. No. 6, ECF No. 61-6.) Officer Ellis "was facing the stage" when she "heard somebody screaming 'Juicy,' a couple times." (Ellis Dep. 17:15, 33:6, ECF No. 61-3.) Once she "turned

around the yelling had stopped." (*Id.* at 33:10–11.) However, Officer Ellis "observed a female[2] waving her arms in the air" who was seated in the area where "David Marshall was seated immediately after hearing somebody screaming 'Juicy.' [Officer Ellis] went over to speak with her" in order to tell her "that she needed to lower her voice and stop yelling or she'd be asked to leave." (*Id.* at 17:16–21.) When Officer Ellis walked up to talk to that woman, "[t]he male sitting directly to the right of her and the male sitting directly in front of him[3] began yelling at me that it wasn't her that was screaming." (*Id.* at 18:2–5.)

At that point, Officer Ellis said "[t]hen just be quiet. Then I just need you guys to lower your voice and stop arguing. Just be quiet." (*Id.* at 18:7–8.) But David Marshall said, "No. I will not be quiet." (*Id.* at 18:19.) After Officer Ellis had spoken to Michelle Thurmond, "[David Marshall] was approximately four inches from [her] face saying that I had the wrong person." (*Id.* at 35:21–23.)[4] Officer Ellis "believed at the time [she] had the right person. But when they were arguing with [her]," she began to have doubts that she had the right person. (*Id.* at 18:10–11.) While Officer Ellis attempted to quiet the Plaintiffs' party, at least four other police officers arrived, including Sergeant Finnerty, having "heard a male's voice screaming." (Finnerty Dep. 23:8, 23:16–17.) That voice turned out to be David Marshall's, whom the police officers "tried to get" to be quiet, because by that point "Mr. Thurmond had quieted down." (Ellis Dep. at 18:21–24; Ellis Answers Interrog. No. 9, ECF No. 61-7.)

Because David Marshall "would not be quiet . . . he was asked to leave the auditorium." (Ellis Dep. at 19:1–2.)[5] The Defendant Officers "did not see anybody put their hands on [the

---

[2] The parties do not contest that this female was Michelle Thurmond.
[3] The parties do not contest that these males were Lawrence Thurmond and David Marshall, respectively.
[4] Officer Ellis is "a five-foot five female officer," whereas David Marshall is "a very large[,] . . . very intimidating man" because of "his girth, his size." (Finnerty Dep. 35:3–6, ECF No. 61-4.)
[5] In her deposition testimony, Officer Ellis stated:

Plaintiffs]" as they were escorted out of the auditorium. (*Id.* at 19:7–13.) Once they were outside,

"Mr. Marshall was arguing that he wanted to go back inside. He tried to say that we knew him."

(*Id.* at 37:18–20.) However, Sergeant Finnerty decided that David Marshall could not come back

in "[b]ecause he was loud, he caused a disturbance, it was apparent that he was not going to calm

down, it was apparent that he was going to continue with his actions." (Finnerty Dep. 28:5–8.)[6]

Sergeant Finnerty threatened "to take [David Marshall] to his own jail," but ultimately chose not

to arrest him "[b]ecause he was a policeman" and did not make a police report because he made

no arrest. (*Id.* at 33:4–15.) Even once David Marshall had calmed down somewhat, Sergeant

Finnerty "did not let him go back into that graduation" because "he'd already committed

[disorderly conduct]." (*Id.* at 30:17–22.) However, because no one "had instructed [LaMisa

Marshall] to leave in the first place," Sergeant Finnerty "allowed her to go back in." (Ellis Dep.

20:6–10.)

## COMPLAINT ALLEGATIONS AND PROCEDURAL BACKGROUND

On January 23, 2014, the Plaintiffs filed a Complaint [ECF No. 1] against the Defendant

Officers and the Town of Merrillville. In Count I, they alleged that the Defendants violated the

Plaintiffs' right to peaceably assemble "[b]y forcing Plaintiffs out of their daughter's graduation

without just cause," in violation of 42 U.S.C. § 1983. (Compl. ¶ 33, ECF No. 1.) In Count II,

---

A: When [David Marshall] was instructed to leave, before he left he said "Okay, then. I
got you. I got you, Finnerty. I got you too, Ellis."
Q: And what did you think that meant?
A: I took that as a threat.
Q: How so?
A: that he will retaliate in some way.
(Ellis Dep. 25:3–9.)
[6] In his deposition testimony, Sergeant Finnerty stated that he based his decision to keep David
Marshall out of the auditorium "on [his] actions . . . [b]eing boisterous, screaming in a theater, resisting an
officer actually, not taking directions when told to." (*Id.* at 28:23–29:2.)

they alleged that the Defendants committed the tort of intentional infliction of emotional distress by "intentionally extreme and outrageous conduct of . . . forcibly removing Plaintiffs from their daughter's graduation." (*Id.* ¶ 34.) In Count III, they alleged that the Town of Merrillville breached its duty to the Plaintiffs to hire and retain employee police officers who were qualified and properly trained which the Town breached by hiring and retaining [the Defendant Officers] proximately causing Plaintiffs' injuries at their daughter's graduation" and failed to do so. (*Id.* ¶ 35.)

The Complaint was removed to federal court on February 14, 2014. The Defendants filed an Answer with Affirmative Defenses [ECF No. 10] on March 24, 2014. After discovery, the Defendants filed two Motions on September 21, 2015. The first was a Motion to Bar the Testimony of the Plaintiffs' Expert Witness, to which the Plaintiffs' Response [ECF No. 64] was filed on October 6, 2015, and the Defendants' Reply [ECF No. 70] on November 2, 2015. The second was a Motion for Summary Judgment, to which the Plaintiffs Response [ECF No. 67] was filed on October 21, 2015, and the Defendants' Reply [ECF No. 71] on November 2, 2015.

## DISCUSSION

### A.      Motion for Summary Judgment

The Court has subject-matter jurisdiction over the Plaintiffs' § 1983 claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over the Plaintiffs' remaining state law claims pursuant to 28 U.S.C. § 1367. The Court's analysis of the Defendants' Motion for Summary Judgment does not consider the opinions and testimony of the Plaintiffs' expert, Joseph R. Blaettler, as they are unnecessary for the Court to render its ruling. The Defendant's Motion to Bar Mr. Blaettler's Opinions and Testimony is addressed below.

*1.      Standard of Review*

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is the moment in litigation where the nonmoving party is required to marshal and present the court with evidence on which a reasonable jury could rely to find in that party's favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court should only deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (first citing *United States v. 5443 Suffield Terrace*, 607 F.3d 504, 510 (7th Cir. 2010); then citing *Swearnigen–El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 859 (7th Cir. 2010)). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. [A] court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Material facts are those that are outcome determinative under the applicable law. *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *see Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

## 2.    *Standing*

The Defendants challenge LaMisa Marshall's standing in this case. Standing is a constitutional requirement for which a Plaintiff must show (1) "injury in fact," which is an invasion of a legally protected interest that is either "concrete and particularized" or "actual and imminent," rather than conjectural or hypothetical; a (2) causal connection such that the injury is fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court; and (3) that it is likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). A party must assert their own interests and may not assert those of a third party. *Massey v. Helman*, 196 F.3d 727, 739 (7th Cir. 1999).

The Defendants argue that LaMisa Marshall did not suffer an injury-in-fact because the police did not require her to come outside with David Marshall, and she was able to return to the auditorium after only five minutes of being out with the police. With regard to the first contention, the Plaintiffs have offered evidence showing that LaMisa believed she was required to follow the police outside. The fact that there were at least four police officers confronting her husband in a quiet auditorium and asking him to leave shows that she believed that she had no choice but to follow him. If LaMisa had no choice, then she would have suffered an injury-in-fact because the police would have deprived her of her interest in remaining at the ceremony. With regard to the second contention, the Court believes that the five minute timespan that LaMisa was barred from the auditorium does not render her legally protected interest insubstantial. *See Sierra Club v. Franklin Cnty. Power of Ill., LLC*, 546 F.3d 918, 925 (7th Cir. 2008) (noting that an injury "need not be large, an identifiable trifle will suffice"). Accordingly, the Court finds that LaMisa has standing to sue.

**3.** *Constitutional Violations*

a.     *The Defendant Officers' Liability Under § 1983*

The Plaintiffs allege a 42 U.S.C. § 1983 claim against the Defendants. When public officers violate the constitutional rights of citizens, § 1983 provides the vehicle for a legal claim. *Savory v. Lyons*, 469 F.3d 667, 670 (7th Cir. 2006). Section 1983 imposes liability on any "person" who, while acting under color of state law, deprives an individual of federally protected rights. 42 U.S.C. § 1983; *see Gomez v. Toledo*, 446 U.S. 635, 640 (1980). Section 1983 authorizes claimants to sue persons in their individual capacities who are alleged to have violated such rights. *Lewis v. Downey*, 581 F.3d 467, 472–73 (7th Cir. 2009). Section 1983 also authorizes claimants to sue persons in their official capacities. *See Estate of Sims ex rel. Sims v. Cnty. of Bureau*, 506 F.3d 509, 514–15 (7th Cir. 2007). Personal involvement is an element of every claim under 42 U.S.C. § 1983. *Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001).

However, the Defendants have asserted that they are entitled to qualified immunity on the Plaintiffs' § 1983 claim, which is a doctrine that protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). Qualified immunity is intended to strike a balance between "protect[ing] a government official's ability to function without the threat of distraction and liability" and "afford[ing] members of the public the ability to vindicate constitutional violations by government officials who abuse their offices." *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014) (internal quotation marks and citations omitted). Evaluating a qualified immunity defense requires two inquires: (1) whether the facts, taken in the light most favorable to the

plaintiffs, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Williams v. City of Chi.*, 733 F.3d 749, 758 (7th Cir. 2013) (citation omitted). "If *either* inquiry is answered in the negative, the defendant official is entitled to summary judgment." *Gibbs*, 755 F.3d at 537. The Court is not required to address the prongs in order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The Plaintiffs expressly alleged that the Defendants violated their First Amendment "right to peaceably assemble" when the Defendants forced the Plaintiffs out of the graduation without just cause. (Compl. ¶ 33.) Although the First Amendment does not expressly protect the "right of association," the United States Supreme Court has recognized such a right in two respects. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18 (1984). First, the "right of association" protects "choices to enter into and maintain certain intimate human relationships [that] must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." *Id.* "In this respect, freedom of association receives protection as a fundamental element of personal liberty." *Id.* at 618. Second, the Supreme Court "has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Id.*

Here, the facts do not implicate a right to intimate association. All that could be implicated in a First Amendment claim is the Plaintiffs' right to associate for the purpose of engaging in protected activities, such as "speech, assembly, petition for the redress of grievances, or the exercise of religion." *Id.* at 617–18. The Plaintiffs' brief asserts that their "Participation in a Graduation Constitutes Peaceful Assembly" (Resp. to Mot. Summ. J. 7, ECF No. 67), to which they rely solely upon *Swank v. Smart*, 898 F.2d 1247 (7th Cir. 1990). The Plaintiffs also argue

that their "participation in the graduation ceremony constituted expressive activity" akin to the free exercise of religion. (Resp. to Mot. Summ. J. 7.)[7] To support this argument, they cite to *Tanford v. Brand*, 883 F. Supp. 1231 (S.D. Ind. 1995), *aff'd* 104 F.3d 982 (7th Cir. 1997).

In *Swank*, a police officer was discharged because a colleague observed his off-duty encounter with a 17-year-old college student. 898 F.2d at 1250. The discharged police officer claimed his termination for that reason violated his First Amendment right to association. *Id.* The court denied his claim because "the right of association['s purpose] is to protect the market in ideas, broadly understood as the public expression of ideas, narratives, concepts, imagery, opinions . . . to an audience whom the speakers seeks to inform, edify, or entertain." *Id.* at 1250–51 (citation omitted). The right does not extend to expressive activities that were "important to participants but not to the advancement of knowledge, the transformation of taste, political change, cultural expression, and the other objectives, values, and consequences of the speech that is protected by the First Amendment." *Id.* at 1251. In *Tanford*, the plaintiffs unsuccessfully challenged that a university's graduation ceremony violated the Establishment Clause, because it started with a benediction and invocation. *Tanford*, 883 F. Supp. at 1247. Relevant here, one of the plaintiffs was solely invited to attend in the audience but the Court held that he lacked standing to sue because his attendance did not give him a legally protected interest, such as the free exercise of religion. *Id.* at 1236 ("If he decided to attend, he is no more than an observer with nothing at stake in the ceremony besides the psychological consequence presumably

---

[7] In a footnote, the Plaintiffs argue that "clergy performing invocations and benedictions at school graduations *violate* the Establishment Clause therefore, this Court should view Plaintiffs' participation in the graduation ceremony as an exercise of freedom of religion." (Resp. to Mot. Summ. J. 7 n.3. (emphasis added).) This statement does not logically follow, and the Court could not locate case precedent to support such a logically unsound proposition, so the Court declines to analyze it.

produced by observation of conduct with which one disagrees.") (internal quotation marks omitted).

Neither of these precedents persuades the Court that the Plaintiffs' First Amendment rights were violated. *Swank* delineates that the First Amendment protects expressive activities that qualify as "ideas, narratives, concepts, imagery, [or] opinions." 898 F.2d at 1251. While a graduation ceremony is an important milestone for a family, that fact "is not sufficient to bring the [the Plaintiffs' attendance] within the protection of the First Amendment." *Id.* (quoting *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989). *Tanford* is also persuasive because the Plaintiffs' mere attendance at the graduation ceremony did not somehow confer upon them a legally protected interest in the free exercise of their religion. Accordingly, the Plaintiffs' § 1983 claim cannot survive under a First Amendment theory.

However, the parties' briefing on qualified immunity presents "an alternative legal characterization" of the § 1983 claim as a Fourth Amendment violation. *See Whitaker v. Milwaukee Cnty., Wisc.*, 772 F.3d 802, 808–09 (7th Cir. 2014) (holding that a plaintiff may present a new legal theory at summary judgment if the pleaded factual allegations in the complaint support that theory). The Plaintiff argues that there was no "basis for Defendants to arrest" David Marshall (Resp. to Mot. Summ. J. 8–10), whereas the Defendant Officers state that they reasonably asked David Marshall "to remain outside, as opposed to charging him and placing him under arrest" (Reply 5–7, ECF No. 71). This "alternate legal basis for liability is based on the same allegations" and facts as all other allegations raised in the Plaintiffs' Complaint. *Whitaker*, 772 F.3d at 809 n.19 (finding defendants' claim of unfair surprise due to an alternative legal theory "unpersuasive when . . . based on the same allegations" in the complaint); *Del Marcelle v. Brown Cnty. Corp.*, 680 F.3d 887 (7th Cir. 2012) (stating that

"plaintiffs are not required to plead legal theories"). Accordingly, the Court considers the Plaintiffs' § 1983 claim under a Fourth Amendment theory of liability. *See Dennis v. Higgins*, 498 U.S. 439, 443 (1991) (noting that "the coverage of § 1983 must be broadly construed" in light of its "legislative history . . . as a remedial statute") (first quoting *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 105 (1989); then quoting *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 684 (1978)); *see also* Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice.").

The Fourth Amendment provides the right to be free of unreasonable searches and seizures. U.S. Const. amend. IV. "A seizure of the person within the meaning of the Fourth and Fourteenth Amendments occurs when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Kaupp v. Texas*, 538 U.S. 626 (2003) (internal quotation marks omitted); *Florida v. Bostick,* 501 U.S. 429, 437 (1991). Circumstances that would indicate that a person "was not free to leave" include the "threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall,* 446 U.S. 544, 554 (1980). "When a person has no desire to leave for reasons unrelated to the police presence, the coercive effect of the encounter can be measured better by asking whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Carlson v. Bukovic*, 621 F.3d 610, 620 (7th Cir. 2010) (citing *Brendlin v. California*, 551 U.S. 249, 255 (2007)). This inquiry is analyzed against an objective standard. *Abdullahi v. City of Madison*, 423 F.3d 763, 768 (7th Cir. 2005).

Here, the Court has reviewed the designated evidence and applied the facts most favorable to the Plaintiffs to the pertinent case law. Having done so, the Court finds that genuine issues of material fact preclude the Court from finding as a matter of law that the Defendant Officers' actions, in light of the surrounding circumstances, did not constitute an unlawful seizure in violation of the Fourth Amendment. The evidence presented shows that the police confronted the Plaintiffs in an auditorium that was very quiet and made them feel as if they had no choice but to follow them outside. When they left, LaMisa Marshall was pushed outside, while David Marshall was not permitted to return and was threatened with jail time.

The Defendant Officers argue that, even if the Plaintiffs had a right to attend the high school graduation ceremony, they acted reasonably in removing the Plaintiffs. "Probable cause to arrest is an absolute defense to any claim against police officers under § 1983 for wrongful arrest." *Wagner v. Wash. Cnty.*, 493 F.3d 833, 836 (7th Cir. 2007). A police officer has probable cause if, at the time of the arrest, the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person in believing that the suspect has committed an offense. *Id.* Where probable cause is lacking with respect to an arrest, an officer is nevertheless entitled to qualified immunity if his belief that he had probable cause was an objectively reasonable belief. *D.Z. v. Buell*, 796 F.3d 749, 754–55 (7th Cir. 2015) (citing *Humphrey v. Staszak*, 148 F.3d 719, 726 (7th Cir. 1998)). This is known as "'arguable' probable cause." *Id.*

In *Larsen v. Fort Wayne Police Dept.*, 825 F. Supp. 2d 965 (N.D. Ind. 2010), the plaintiff attended his daughter's choir show at her high school. The school had recently enacted a policy prohibiting outside videotaping, but the father was not aware of the policy until he arrived and entered the gymnasium with his video camera. *Id.* at 968–69. The plaintiff was approached by a police officer (who did not identify himself as working for the school) and a school administrator

and told that he was not allowed to record the performance. *Id.* at 969–70. During their discussion, the plaintiff protested that the school had not obtained permission to record his daughter. *Id.* at 970. The officer asked the plaintiff to leave but he refused and went back to his seat. *Id.* at 971. At that point, the officer physically dragged the plaintiff from the gymnasium and arrested him for disorderly conduct and resisting law enforcement, but those charges were subsequently dismissed. *Id.* at 972–73. The plaintiff filed a § 1983 claim against the defendant officer for violating his Fourth Amendment rights when he was dragged from the gymnasium and falsely arrested. *Id.* at 973. The district court denied summary judgment because the evidence presented a question of fact as to whether the defendant officer's decision to arrest the plaintiff for resisting law enforcement was supported by probable cause. *Id.* at 975–77.

The Court believes that *Larsen* is analogous to this case. The Plaintiffs' version of the facts suggests that the disturbance in the auditorium did not come from the Plaintiffs' party. Coupling this fact with the rest of the Plaintiffs' version of events, it would not have been objectively reasonable for the Defendant Officers to believe that the Plaintiffs needed to be removed from the auditorium, as they would have lacked probable cause to make an arrest. But the Defendants' version of events suggest that they had probable cause to remove the Plaintiffs given the disturbance's location and David Marshall's subsequent demeanor. Resolving this issue would require the Court to choose one of the competing versions of events. "The Seventh Circuit has noted that it is inappropriate to grant summary judgment on qualified immunity grounds where it requires the court to decide what the facts were when an officer made an arrest." *Ryan-Louie v. DeFazio*, No. 2:05-CV-249, 2007 WL 433067, at *6 (N.D. Ind. Feb. 2, 2007) (citing *Morfin v. City of E. Chi.*, 349 F.3d 989, 1000 n.13 (7th Cir. 2003)).

Because questions of fact exist as to the Plaintiffs' § 1983 claims against the Defendant Officers in their individual capacities, summary judgment is inappropriate at this time. A jury may well believe the Defendant Officers' account of events and find that they acted reasonably or did not violate the Plaintiffs' constitutional rights. However, "decid[ing] whom to believe" is the jury's duty at trial, not the Court's duty at summary judgment. *Waldridge*, 24 F.3d at 920.

b.    *Municipal Liability Under § 1983*

"Section 1983 does not establish a system of vicarious responsibility." *Burks v. Raemisch*, 555 F.3d 592, 593 (7th Cir. 2009). Instead, "[l]iability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise." *Id.* at 594; *see also Monell*, 436 U.S. at 694 (holding that a "local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents"). A government entity can be held liable under § 1983 for its own acts, as opposed to those of its employees, as long as those acts are the moving force behind the constitutional violation. *Estate of Sims*, 506 F.3d at 514–15. A government entity acts through its official policy or custom, which can be demonstrated by the following:

> (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) the constitutional injury was caused by a person with final policymaking authority.

*Id.* at 515; *Baxter v. Vigo Cnty. Sch. Corp.*, 26 F.3d 728, 735 (7th Cir. 1994). Liability based upon a widespread practice requires a showing that a number of similar incidents establish an unconstitutional pattern of conduct. *Palmer v. Marion Cnty.*, 327 F.3d 588, 595–96 (7th Cir. 2003).

Here, the Plaintiffs have not offered sufficient evidence to demonstrate that the Town of Merrillville was the moving force behind the constitutional violations. First, the Plaintiffs have not offered any evidence that it was the Merrillville Police Department's express policy that led to constitutional deprivations. Second, there is no evidence showing that either of the Defendant Officers who were sued in this case had final policymaking authority. Third, the other individual incidents that the Plaintiffs offer as evidence—Gary Carter in 2007, Valerie Green in 2008, and Sean Nevils in 2015—involved factual allegations dissimilar from the Plaintiffs' case and thus fail to establish a widespread pattern of unconstitutional conduct. Arguing that the Defendant Officers were not investigated for misconduct on other occasions is insufficient to establish a widespread practice for purposes of § 1983 municipal liability. *Thompson v. City of Chi.*, 472 F.3d 444, 454–55 (7th Cir. 2006) ("[T]he violation of police regulations . . . is completely immaterial as to the question of whether a violation of the federal Constitution has been established."). Accordingly, the Town of Merrillville cannot be held liable under § 1983.

**4.      *State Law Claims***

The Plaintiffs allege state law claims for intentional infliction of emotional distress and for negligent hiring and retention. (Compl. ¶¶ 34–35.) However, they fail to specify in their Complaint which claims are alleged against which Defendants. Accordingly, the Court analyzes each claim in turn as to all Defendants.

a.      *Intentional Infliction of Emotional Distress*

In Indiana, a claim for intentional infliction of emotional distress requires a showing that the defendant, by extreme or outrageous conduct, intentionally or recklessly caused the plaintiff severe emotional distress. *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991). "It is the intent to

17

harm the plaintiff emotionally which constitutes the basis for the tort," and the burden of proof in establishing the tort is "rigorous." *Curry v. Whitaker*, 943 N.E.2d 354, 361 (Ind. Ct. App. 2011) (quoting *Cullison*, 570 N.E.2d at 31). The evidence put forth shows that this claim only pertains to the Defendant Officers. Viewing that evidence in a light most favorable to the Plaintiffs, the Court concludes that the Defendant Officers' actions were not "outrageous." Even if the Defendant Officers held an unreasonable belief that the Plaintiffs were the source of the disturbance during the ceremony, their actions were not "atrocious, and utterly intolerable in a civilized community." *Bradley v. Hall*, 720 N.E.2d 747, 753 (Ind. Ct. App. 1999). Rather, the Defendant Officers acted as the community had charged them to act, namely, to maintain order and public safety at the graduation. The cases that the Plaintiffs rely upon involved situations of life and death and are not persuasive here. *Shemenski v. Chapieski*, No. 03 C 0861, 2005 WL 991831, at *8–15 (N.D. Ill. Apr. 13, 2005) (finding that detaining the plaintiff's husband when their daughter was critically ill at a hospital constituted outrageous conduct); *Inlow v. Wilkerson*, 774 N.E.2d 51, 57 (Ind. Ct. App. 2002) (finding that the possibility that the defendant would bar the plaintiff from a funeral was not extreme or outrageous, and at most "merely unreasonable"). Accordingly, the Defendants are entitled to judgment as a matter of law on the Plaintiffs' intentional infliction of emotional distress claim.[8]

b.      *Negligent Hiring and Retention*

In Indiana, a claim for negligent hiring and retention requires evidence of the following: (1) a duty of care owed by an employer to a third person; (2) a breach of that duty; and (3) the employer's breach proximately caused injury to the third person. *Scott v. Retz*, 916 N.E.2d 252,

---

[8] The Court's determination obviates any need to address the Defendant Officers' claim of immunity under state law.

257 (Ind. Ct. App. 2009). A claim for negligent hiring and retention is only available against an employer when an employee "steps beyond the recognized scope of his employment to commit a tortious injury upon a third party." *Bd. of Comm'rs of Indianapolis v. Pettigrew*, 851 N.E.2d 326, 332 (Ind. Ct. App. 2006). There can be no claim for negligent hiring and retention if "the employee was within the scope of his employment." *Id.* In order for an employee to act within the scope of employment, "the injurious act must be incidental to the conduct authorized or it must, to an appreciable extent, further the employer's business." *Barnett v. Clark*, 889 N.E.2d 281, 283–84 (Ind. 2008) (citations omitted).

Here, the Plaintiffs have not argued that the Defendant Officers acted outside of the scope their employment, and the Town of Merrillville stipulated in its briefing that they acted within the scope of their employment. (Reply 14; Mot. Summ. J. 23, ECF No. 61.) The evidence presented at summary judgment supports this finding. The Defendant Officers provided security at the graduation of a public high school, in furtherance of the Police Department's objectives. Whether or not removing the Plaintiffs from the auditorium violated their constitutional rights, the Defendant Officers acted to further their employer's business. Accordingly, the Defendants are entitled to judgment as a matter of law on the Plaintiffs' negligent hiring and retention claim.

## B.    Motion to Exclude

### 1.    *Rule 702 and Daubert Standard*

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Rule 702 charges trial judges with the responsibility of acting as "gatekeeper[s] with respect to testimony proffered under Rule 702 to ensure that the testimony is sufficiently reliable to qualify for admission."

*Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)). "The purpose of [the *Daubert*] inquiry is to vet the proposed testimony under Rule 702's requirements that it be 'based on sufficient facts or data,' use 'reliable principles and methods,' and 'reliably appl[y] the principles and methods to the facts of the case.'" *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 804 (7th Cir. 2012) (quoting Fed. R. Evid. 702). In evaluating whether an expert's proposed testimony meets the *Daubert* standard, the court is to "scrutinize the proposed expert witness testimony to determine if it has 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field' so as to be deemed reliable enough to present to a jury." *Lapsley*, 689 F.3d at 805 (quoting *Kumho Tire*, 526 U.S. at 152). Whether to admit expert testimony rests within the discretion of the district court. *See Gen. Elec. v. Joiner*, 522 U.S. 136, 142 (1997); *Lapsley*, 689 F.3d at 810 ("[W]e 'give the district court wide latitude in performing its gate-keeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable.'") (quoting *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011)). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. *Lewis*, 561 F.3d at 705; *see also* Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified."); *Id.* 702 advisory committee note (2000 Amends.) ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.").

District courts apply the *Daubert* framework described above using a three-part analysis. *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). First, the Court must determine

whether the proposed witness is qualified as an expert by knowledge, skill, experience, training, or education. If so, the Court must then decide whether the reasoning or methodology underlying the expert's testimony is reliable. If these two requirements are met, the Court must assess whether the expert's proposed testimony will assist the trier of fact in understanding the evidence or to determine a factual issue. *See id.* (citing *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007)).

"Although the court must decide questions of admissibility, the weight and credibility to be accorded expert testimony is properly left to the jury." *Contractor Util. Sales Co. v. Certain-teed Prods. Corp.*, 638 F.2d 1061, 1085 n.32 (7th Cir. 1981). The Defendant will have the opportunity to expose those weaknesses at trial and, as the court in *Daubert* stated, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

**2.      *Analysis***

The Defendants move to exclude the opinions of Joseph R. Blaettler. In support of their Motion, the Defendants first argue that Mr. Blaettler's background does not qualify him to offer legal opinions on the constitutional claims in this case. Second, they argue that Mr. Blaettler had no methodological basis for his opinions, as he failed to review key documents relating to the Defendants' hiring and training standards for its employees. Third, the Defendants argue that Mr. Blaettler's opinions are not relevant as to the claims in this case and would fail to assist a jury in determining any of the fact questions presented here. The Plaintiffs argue that Mr. Blaettler's background is comparable to other experts who have offered legal opinions in police discipline, policy, and procedure cases. Additionally, they argue that Mr. Blaettler may base his opinions

upon the Plaintiffs' version of the events, that he also has personal knowledge of many of the facts that he bases his opinions upon, and that his opinions would assist a jury in determining any of the issues presented in this case.

Because the Court did not find it necessary to consider Mr. Blaetter's opinions and testimony in order to rule on the Defendants' Motion for Summary Judgment, the Court need not rule on the Defendants' Motion to Bar his opinions and testimony at this time. Accordingly, the Motion to Bar Opinions and Testimony of Joseph R. Blaettler is denied without prejudice. The Defendants are granted leave to renew their motion in a future instance should it be appropriate, such as in a motion in limine at trial.

## CONCLUSION

For the foregoing reasons, the Court DENIES the Defendants' Motion to Bar Opinions and Testimony of Joseph R. Blaettler [ECF No. 62] and GRANTS IN PART and DENIES IN PART the Defendants' Motion for Summary Judgment [ECF No. 60]. Summary Judgment is DENIED as to Count I and GRANTED as to Counts II and III.

SO ORDERED on January 11, 2017.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION